# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

STANLEY LOGAN,            )
                                   )
          Plaintiff,          )
                                   )
          v.                    )       No. 4:07-CV-1948 CAS
                                   )
MICHAEL CHERTOFF,        )
Secretary of the Department of    )
Homeland Security,           )
                                   )
          Defendant.      )

## MEMORANDUM AND ORDER

Pending before the Court is defendant Michael Chertoff's motion for summary judgment.[1] The motions having been fully briefed,[2] the matter is ripe for review. For the following reasons, the Court will grant defendant's motion for summary judgment and dismiss plaintiff's claims against it.

---

[1] In conjunction with its motion for summary judgment, defendant also submitted a motion to dismiss plaintiff's sex discrimination claims based on his failure to exhaust his administrative remedies with respect to these claims. Because defendant has attached to its motion to dismiss affidavits, exhibits and matters outside the pleadings, the Court will construe the motion to dismiss as one for summary judgment. See Fed.R.Civ.P. 12(d). Given that plaintiff has had ample opportunity to present any and all materials that are pertinent to his case and has referred to matters outside the pleadings in his responses, the Court will consider the exhaustion issue herein. See Riehm v. Engelking, 538 F.3d 952, 962 n. 5 (8th Cir. 2008).

[2] Plaintiff has submitted no less than four briefs directly related to defendant's motions to dismiss and for summary judgment. See Doc. Nos. 82, 85, 86 and 90. Additionally, plaintiff has addressed defendant's motions in his "motion to continue trial setting," Docket No. 87, as well as a "memo" filed by plaintiff, Docket No. 90. The Court will consider all of the aforementioned as plaintiff's responses to defendant's motions.

## I.  Background

Plaintiff, a former employee with the Transportation Security Administration ("TSA"), filed the instant pro se employment discrimination case against defendant pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e et seq., and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 et seq., alleging that he was subjected to harassment based on his race, color, sex, age and religion, and that his termination was retaliatory.[3]  Plaintiff seeks compensatory and punitive damages.

As noted above, plaintiff originally sought dismissal of plaintiff's gender discrimination claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing that plaintiff had failed to exhaust his administrative remedies with respect to these claims.  Defendant attached to its motion to dismiss, however, matters it raised outside the record.  Accordingly, the Court has converted defendant's motion into one for summary judgment and will review those claims herein.

---

[3] In his complaint, plaintiff also alleged that he was being discriminated against on the basis of his "perceived sexual orientation." This is not a protected class under Title VII or the ADEA, and plaintiff has not indicated that he is proceeding against defendant under any other statutory or common law basis. Williamson v. A.G. Edwards & Sons, Inc., 876 F.2d 69, 70 (8th Cir. 1989); DeSantis v. Pacific Tele. & Tele. Co., 608 F.2d 327 (9th Cir. 1979); Simonton v. Runyon, 232 F.3d 33 (2nd Cir. 2000). Even if plaintiff would have brought his claims pursuant to Executive Order 13,087 (May 28, 1998), the amended version of Executive Order 11,478 (August 8, 1969), which addresses equal employment opportunity in the federal government and indeed, prohibits discrimination on the basis of sexual orientation, his claim would still be subject to dismissal. On May 2, 2002, Section 11 was added to Executive Order 11,478. It provides: "This Executive Order does not confer any right or benefit enforceable in law or equity against the United States or its representatives." Citing Independent Meat Packers Assn. v. Butz, 526 F.2d 228, 234-35 (8th Cir. 1975), the court in Centola v. Potter, 183 F. Supp.2d 403, 413-14 (D. Mass. 2002), found that Executive Order Nos. 13,087 and 11,478 do not "expand the reach of Title VII to protect against discrimination on the basis of sexual orientation" and "do not create a judicially enforceable private right of action." Accordingly, defendant would be entitled to summary judgment on this claim.

In addition to moving for dismissal on plaintiff's sex discrimination claims, defendant now moves for summary judgment on plaintiff's remaining claims. With regard to plaintiff's hostile work environment/harassment claims, defendant asserts: 1) that plaintiff's allegations of a hostile work environment are not severe or pervasive enough to satisfy the legal standards for harassment and/or did not alter the terms and conditions of plaintiff's employment; 2) that any alleged harassment plaintiff was subjected to was not as a result of his protected traits; and 3) that defendant took prompt, remedial action with regard to plaintiff's complaints of harassment. Defendant moves for summary judgment on plaintiff's retaliation claims, asserting: 1) the fitness-for-duty inquiry was not an adverse action; 2) the plaintiff cannot show a causal connection between his termination and his protected activity; and 3) plaintiff cannot show that "but for" his protected activity he would not have been terminated. The issues having been fully briefed, the matter is now ready for review.

## II. Summary Judgment Standard

The standard applicable to summary judgment motions is well-settled. Pursuant to Federal Rule of Civil Procedure 56(c), a court may grant a motion for summary judgment if all of the information before the court shows "there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." See Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The initial burden is placed on the moving party. City of Mt. Pleasant, Ia. v. Associated Elec. Co-op., Inc., 838 F.2d 268, 273 (8th Cir. 1988) (the moving party has the burden of clearly establishing the non-existence of any genuine issue of fact that is material to a judgment in its favor). Once this burden is discharged, if the record shows that no genuine dispute exists, the burden then shifts to the non-moving party who must set forth affirmative evidence and specific facts showing

there is a genuine dispute on a material factual issue. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986).

Once the burden shifts, the non-moving party may not rest on the allegations in its pleadings, but by affidavit and other evidence he or she must set forth specific facts showing that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); <u>Herring v. Canada Life Assur. Co.</u>, 207 F.3d 1026, 1029 (8th Cir. 2000). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." <u>Matsushita Elec. Indus. Co., v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986). A dispute about a material fact is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." <u>Herring</u>, 207 F.3d at 1029 <u>quoting</u> <u>Anderson</u>, 477 U.S. at 248. A party resisting summary judgment has the burden to designate the specific facts that create a triable question of fact. <u>See</u> <u>Crossley v. Georgia-Pacific Corp.</u>, 355 F.3d 1112, 1114 (8th Cir. 2004). "Self-serving, conclusory statements without support are not sufficient to defeat summary judgment." <u>Armour and Co., Inc. v. Inver Grove Heights</u>, 2 F.3d 276, 279 (8th Cir. 1993).

In passing on a motion for summary judgment, it is not the court's role to decide the merits. The court should not weigh evidence or attempt to determine the truth of a matter. Rather, the court must simply determine whether a genuine issue of material fact exists. <u>Bassett v. City of Minneapolis</u>, 211 F.3d 1097, 1107 (8th Cir. 2000).

The Eighth Circuit has stated that summary judgment should seldom be used in cases alleging employment discrimination. <u>Kells v. Sinclair Buick-GMC Truck, Inc.</u>, 210 F.3d 827, 830 (8th Cir. 2000). Summary judgment is not appropriate in employment discrimination cases unless all the evidence points one way and is susceptible of no reasonable inference of discrimination. <u>Breeding v.</u>

Arthur J. Gallagher and Co., 164 F.3d 1151, 1156 (8th Cir. 1999). Summary judgment is appropriate, however, if the plaintiff has failed to present evidence sufficient to create a jury question as to an essential element of his claim. Whitley v. Peer Review Sys., Inc., 221 F.3d 1053, 1055 (8th Cir. 2000) citing Chock v. Northwest Airlines, Inc., 113 F.3d 861, 865 (8th Cir. 1997).

### III.  Facts

Local Rule 4.01(E) provides, with respect to summary judgment motions:

> A memorandum in support of a motion for summary judgment shall have attached a statement of uncontroverted material facts, set forth in a separately numbered paragraph for each fact, indicating whether each fact is established by the record, and, if so, the appropriate citations. Every memorandum in opposition shall include a statement of material facts as to which the party contends a genuine dispute exists. Those matters in dispute shall be set forth with specific references to portions of the record, where available, upon which the opposing party relies. The opposing party also shall note for all disputed facts the paragraph number from movant's listing of facts. All matters set forth in the statement of the movant shall be deemed admitted for purposes of summary judgment unless specifically controverted by the opposing party.

E.D. Mo. L.R. 4.01(E).

In support of its motion for summary judgment, the government submitted a Statement of Uncontroverted Material Facts listing twenty-one (21) uncontroverted facts with citations to the record. Defendant listed six (6) additional uncontroverted facts in conjunction with its motion to dismiss.  Plaintiff, however, did not file a statement of material facts as to which he contends a genuine issue exists, and he failed to identify the paragraph numbers from defendant's statements of uncontroverted facts for any facts that he contends are in dispute.  Instead, plaintiff filed several responses, which appear to be a stream of consciousness, with general refutations and no specific

references to portions of the record upon which these are based.[4]  Indeed, plaintiff failed to submit any deposition testimony, affidavits or testimony under oath regarding his allegations, and his complaint is not verified.  Accordingly, plaintiff's responses are insufficient to meet the requirements of Local Rule 4.01(E), and he is deemed to have admitted all facts in defendant's statements of uncontroverted facts. Deichmann v. Boeing Co., 36 F. Supp.2d 1166, 1168 (E.D.Mo. 1999), aff'd, 232 F.3d 907 (8th Cir. 2000), cert. denied, 531 U.S. 877. Cf. Northwest Bank & Trust Co. v. First Ill. Nat'l Bank, 354 F.3d 721, 725 (8th Cir. 2003) (holding that the district court did not abuse its discretion by applying local rules that excluded some of the material facts offered in opposition to a motion for summary judgment).

With this in mind, Court accepts the following facts as true for purposes of summary judgment:

Plaintiff is African American and was an employee of the Transportation Security Administration ("TSA") located at Lambert International Airport in St. Louis, Missouri.  Plaintiff worked as a Transportation Security Screener and was responsible for screening passengers and employees entering the airport.  His appointment with TSA became effective on September 8, 2002.

In November of 2002, plaintiff contacted Screening Manager Terry Hayes to report that he was being subjected to harassment, assault, abuse, and targeting.  Specifically, plaintiff said that:  1) Screener Morris told him that he was being "targeted" about his hair; 2) Mobile Screener Ernest walked behind him and stated that he could not go behind plaintiff because his "butt was too big";

---

[4] In addition to the plethora of "briefs" filed in response to defendant's motions, plaintiff has also filed a request to file an amended complaint.  The deadline to amend the pleadings has long since expired, and there is nothing to suggest plaintiff can remedy the deficiencies in his complaint through amendment.   Accordingly, plaintiff's request to file an amended pleading will be denied.

and 3) that Screener Ernest later told him that women liked him because of his gray ponytail and that he was a "Panther" in the 1960's.

On November 24, 2002, plaintiff notified Hayes that he had informed Human Resource Specialist Ruth Graham that there was a "color problem among the blacks." He stated that light-skinned blacks are not liked by the "Blacks" and are considered arrogant. He also told Graham that he still believed that he was being "targeted," and that a "file" was being kept on him, and that supervisors were sending screeners to collect "intelligence" on him.

Plaintiff also met with Human Resource Specialist Richard Nelms and Field Counsel Roberto Maldonado. During the meeting, plaintiff asserted he was being "targeted" by supervisors and managers. He was informed about the legal procedures available to him and informed that he would be given an opportunity to review his training file.

Screening Manager Robert Henrich was assigned to investigate plaintiff's allegations. On December 6, 2002, Henrich spoke to plaintiff, as well as several screeners and supervisors, about plaintiff's allegations. Plaintiff stated that he was being picked on and that a Lead Screener was "out to get him." Plaintiff also claimed that TSA was keeping a "secret training file" on him that was being used to "target" him. Beyond these generalized statements, plaintiff was unable to explain his claims, and when questioned, he lost patience with Henrich. Although unable to substantiate plaintiff's claims, Henrich gave plaintiff his cell phone number and instructed plaintiff to call him if anything else occurred.

Henrich spoke with plaintiff three times between December 10, 2002 and December 19, 2002, based on continued, but generalized, messages from plaintiff that he was being targeted and harassed and retaliated against, and also regarding plaintiff's request to review "secret" files being kept on him.

Plaintiff indicated that he believed supervisors and managers were targeting him, and that he thought there was a TSA "plant" being used to gather information about him. Henrich spoke to plaintiff's supervisors who stated that plaintiff did not get along well with his co-workers.

On December 11, 2002, Henrich contacted plaintiff and informed him that his allegations and complaints could not be substantiated and that without any new information, he could do nothing more. Henrich advised plaintiff to contact him or anyone else in his chain of command immediately if he believed he was being mistreated. During that phone call, plaintiff stated that he accepted that there was no conspiracy and that he was just being "paranoid."

On December 19, 2002, Henrich spoke to plaintiff again, this time about a conflict with a Lead Screener, and in regards to plaintiff being written up for leaving his post without permission. Plaintiff insisted that he was being harassed and targeted, that everyone at TSA was hostile and threatening, and that he did not trust anyone at TSA. Plaintiff requested that TSA "take the target off" in order to eliminate the alleged harassment.

Henrich again spoke to plaintiff's supervisors and was informed that plaintiff was frequently antagonistic, did not get along with anyone, and was not receptive to direction or constructive criticism. Plaintiff's response to his supervisors during corrective procedures was that he was being unjustly singled out.

On January 9, 2003, TSA issued Human Resource Management Letter (HRM) 735-1, "Interim Policy on Employee Responsibilities and Conduct." TSA's policy on harassment is outlined in sections 13, 17 and 18 of that policy. TSA was clear in its policies that it had a zero tolerance for workplace harassment. The policy on workplace violence was outlined as follows:

WORKPLACE VIOLENCE: Violent, threatening, harassing and/or confrontational behavior is unacceptable and will not be tolerated. Threatening behavior may include harassment, intimidation, or any oral and/or written remarks or gestures that communicate a direct or indirect threat of physical harm or otherwise frighten or cause an individual concern for his or her personal safety. Such irresponsible and inappropriate behavior may include pushing, poking, physically crowding, stalking, fist-shaking, throwing objects regardless of the target of the object being thrown, name calling, raising the voice in anger, obscene language or gestures, or any other intimidating or abusive action which creates a fearful environment or the apprehension of harm. Employees, supervisors and managers are responsible for enforcing the highest standards of personal safety and welfare at the workplace. Employees must immediately report threats of violence, violent incidents or other inappropriate behavior to their supervisors.

On January 16, 2003, Henrich again spoke to plaintiff about his continued generalized allegations of harassment, targeting and ridiculing. Plaintiff told Henrich that he was being denied breaks, placed into "staged" screening positions, and that "color" is a problem with the TSA population that is "apparently semi-illiterate." When Henrich asked plaintiff to provide specifics and names of anyone who could support his allegations, plaintiff provided nothing more than vague and nonspecific references to previously unsubstantiated events. Henrich informed plaintiff that he would contact plaintiff's supervisors regarding his generalized complaints, and plaintiff responded that everything had been fine until recently and that there was nothing else to investigate. Regardless, on that same date, Henrich spoke to supervisors Marie Dickens, Matt Heindselman and Mike Monroe, who stated that plaintiff did not get along well with his co-workers, was frequently antagonistic, and did not take directions well. They advised Henrich that when plaintiff was being instructed on his job duties he often claimed he was being unjustly singled out and harassed.

On January 27, 2003, plaintiff contacted an EEO counselor at the Office of Civil Rights, alleging that he was being "targeted" as a result of his age, race and color (light skin). At that time, plaintiff did not identify any specific individuals who he believed were targeting him.

9

On February 4, 2003, plaintiff complained to Henrich that five days earlier, Screener Kareem Burns referred to him as "gay" and that plaintiff was under "constant attack," but then insisted to Henrich that he take no action. In spite of plaintiff's request, Henrich spoke to Burns about the allegations, and he denied any such occurrences. Henrich asked plaintiff why he had failed to contact him immediately after the alleged situation occurred, given that he had Henrich's cell phone number. Plaintiff refused to answer. Henrich then informed plaintiff that his insistence that nothing be done after making a complaint was unacceptable. Henrich also informed plaintiff that making unfounded allegations would not be tolerated and that if plaintiff had new information or a complaint of mistreatment he should contact him or notify his chain of command.

On March 11, 2003, Henrich followed up with plaintiff to see how things were going. Plaintiff told Henrich that the "targeting" had continued so that TSA personnel could further their careers, and that he was writing to Federal Security Director Switzer to resolve his complaints.

On March 25, 2003[5], plaintiff filed a formal EEO complaint with TSA's Office of Civil Rights. Plaintiff alleged that he was being discriminated against on the bases of his race, color, religion, age and sexual orientation. Plaintiff also alleged that he was being subjected to reprisal, when he was being singled out for adverse actions (or harassed). Plaintiff's claims of harassment centered around two supervisors, Cliff Gibson and Matt Heindselman, and he asserted that they acted through others to harass him. Namely, plaintiff alleged that on October 15, 2002, Gibson ordered plaintiff to cut his hair, which is "twisted, dreadlike and tied up." On this same date, plaintiff asserts that a coworker "slapped" him on the arm "football style" and told him that his mother would not approve of him.

---

[5]Plaintiff signed the complaint on March 15, 2003, however, it does not appear to have been received by the Office of Civil Rights until March 25, 2003.

Plaintiff states that another screener indicated he was gay and yet another told him "we are going to get you." Plaintiff further alleged that on November 15, 2002, two employees berated him stating his butt was too big, his hair was too long and that he was a radical/Panther. Plaintiff asserted that on this same date a female screener complained about his work performance to a Screening Manager and told him that plaintiff should be fired and whipped and two days later teasingly hit him on the arm and said "I'm going to start whipping you now." Plaintiff also alleged in his complaint that on December 2, 2002, plaintiff reported that supervisors were not giving breaks that comported with Missouri state law and asked screeners to profile drug dealers, which plaintiff states "was interpreted by the screeners as a black person obviously from the inner city." Plaintiff further alleged that on December 12, 2002, Heindselman, acting through another, ordered him off the checkpoint after he had left his post to go to the restroom. Plaintiff also alleged that on January 25, 2003, a screener taunted him and called him gay, and that on February 9, 2003, after asking a screener to stop studying the bible and discussing his views in his presence, plaintiff was subjected to anti-Catholic statements ("priest scandal") and accused of being gay or atheist. Lastly, plaintiff alleged in his complaint that a female screener "charged" him and drove her body into plaintiff to remove a screening wand from him and then reported plaintiff to a supervisor, who subsequently questioned plaintiff about the incident.

On March 25, 2003, several screeners reported that they were offended by plaintiff's comments, while working at a screening checkpoint, that "Saddam was the man" and he can't or won't leave the country because "you people messed up the rest of the world." Two screeners questioned whether this statement was a security threat and reported the incident to management. An African-American screener, Betty Wines, reported that plaintiff was creating a hostile work

environment. She stated that his comments were insulting, offensive and racist, and that they made her uncomfortable because he usually made the comments in front of airline passengers. Plaintiff claims that on this same date he was harassed when another screener pulled at a lock of his long hair.

On March 27, 2003, plaintiff received a verbal warning from Screening Manager Dennis McKenna informing plaintiff that his comments and behavior were considered offensive. Plaintiff denied making the statements and responded that he was being retaliated against. Based upon plaintiff's comments and behavior, in April 2003, Nelms contacted TSA Headquarters and inquired about a fitness-for-duty examination. Nelms spoke with Janet Cammarota, the South Central Region Employee Relations Specialist, as well as TSA attorney Craig Heinz about plaintiff's bizarre behavior. Nelms faxed copies of some of plaintiff's writings to Heinz, but there was no investigation into the prospect of a fitness-for-duty examination. In fact, there is no mechanism in place at TSA for a fitness-for-duty examination, and as such, one was never done on plaintiff.

On June 25, 2003, while working at the checkpoint, plaintiff struck the table several times with a hand-held wand. When Lead Screener Matthew Smith told plaintiff to stop, plaintiff approached Smith and positioned himself in front of Smith's face. Plaintiff then pushed Smith backwards using his chest. Two other screeners witnessed the incident and corroborated Smith's version of the events.

When questioned, plaintiff first denied he hit the table with the wand and denied that he pushed Smith. Plaintiff then stated that Smith was at fault, that he was making a big deal out of the incident, and that Smith did not have the authority to tell plaintiff to stop because Smith was not "his Lead." Plaintiff then stated that he had already stopped his actions prior to being told to do so by Smith.

Based on his altercation with Smith, plaintiff was placed on administrative leave from June 26, 2003 through January 30, 2004. During the leave, the incident was investigated by Screening Manager Warren Klobe. Klobe concluded that based on his previous actions, plaintiff was more than just a "negative influence" on TSA, that he was an actual "threat to security." Accordingly, Klobe recommended that plaintiff be removed from his position.

By memorandum dated November 10, 2003, Assistant Federal Security Director Don Muschler proposed removing plaintiff from federal service for an altercation with physical contact with a supervisor and for making a false statement. Plaintiff responded to the Notice of Proposed Removal on November 10, 2003. In his response, argued that Smith escalated the June 25, 2003 incident. Plaintiff also accused Smith of actually doing the bumping, and stated that Smith had "called him out" like a street thug and threatened to beat him in the parking lot. He also noted that Smith had previously denied him a break and asserted that Operations Officer Eric Bergantz had organized the "targeting." Plaintiff submitted two more responses/statements, dated November 14, 2003 and November 25, 2003, stating that the proposed action was retaliatory. In his responses, plaintiff detailed how and when he felt he had been retaliated against, and he claimed there was a cover-up of the retaliation.

In addition to his responses to Director Muschler, plaintiff also filed, with the Office of Civil Rights, two addenda to his formal complaint. Plaintiff filed the first addendum on November 12, 2003.[6] Plaintiff asserted that the notice of proposed removal was the result of "targeting." Plaintiff was informed by the Office of Civil Rights that the proposal was not a proper basis under which to

---

[6] The "received on" date stamped on the document indicates that the Office of Civil Rights actually received this document on December 5, 2003.

file a claim as it was not an adverse employment action, thus, he was instructed to seek EEO counseling if he was, indeed, terminated. Around February 13, 2004, Plaintiff filed a second addendum to his complaint which included a copy of the appeal of his termination to the TSA Disciplinary Review Board.

On January 30, 2004, plaintiff was terminated by Federal Security Director Switzer for being involved in a physical altercation and for making false statements. In the Notice on Decision, Switzer concluded that plaintiff had a total disregard for TSA Standards of Conduct, that his behavior was inexcusable, and that he shifted blame to others.

On February 5, 2004, plaintiff submitted a copy of his appeal to the TSA Disciplinary Review Board. Much of the appeal referenced his attempts to get a copy of "his files" from Ruth Graham. Plaintiff asserted that after finally receiving a copy of "his file" around January 22, 2004, he noticed that several pages of "his file" had been "wrongfully removed under the Freedom of Information Act." Most notably, plaintiff was missing pages of a fax from Nelms to Cammorata and Heinz regarding the possibility of requiring plaintiff to submit to a fitness-for-duty examination. Plaintiff contended that this inquiry was an act of retaliation. Plaintiff also took issue with several pages of negative disciplinary reports contained in the file which he believed to be false. On February 20, 2004, plaintiff supplemented his appeal with a letter from his then attorney, arguing mainly procedural due process issues with regard to his termination.

On February 26, 2004, the Office of Civil Rights at TSA notified plaintiff that it was accepting for investigation plaintiff's claim that he was subjected to harassment based on his race, color, age and reprisal (for allegedly opposing discriminatory harassment), for the dates between October 15, 2002 until his January 30, 2004, termination, in addition to his claim that he was terminated in

retaliation for his complaints. Plaintiff's then attorney responded to TSA's letter of acceptance on March 16, 2004. In this letter, plaintiff's attorney acknowledged that the basis of the harassment claims were race, color, religion, age, sexual orientation and reprisal. Plaintiff's attorney further clarified the issue of harassment by recounting what plaintiff believed to be additional incidents of alleged harassment that had not been included in his original complaint. Plaintiff made no claims on the basis of gender, and at no point did he initiate counseling with the TSA's Office of Civil rights regarding any alleged gender discrimination.

After plaintiff requested a hearing on his civil rights complaint, an Administrative Law Judge determined that plaintiff had not been wrongfully terminated, and this decision was affirmed by the Commission on September 19, 2007. Plaintiff's request for reconsideration of the decision was denied on November 1, 2007, and plaintiff subsequently filed the instant action in this Court on November 20, 2007.

### IV. Discussion

#### A.     Harassment/Hostile Work Environment Claims

In his complaint, plaintiff claims, generally, that he was subjected to harassment based on his race, color, sex, age and religion.

Defendant moves for summary judgment on plaintiff's hostile work environment claims on the grounds that 1) plaintiff's allegations are not severe or pervasive enough to satisfy the legal standards for harassment and/or did not alter the terms and conditions of plaintiff's employment; 2) that any alleged harassment plaintiff was subjected to was not as a result of his protected traits; and 3) that defendant took prompt, remedial action with regard to plaintiff's complaints of harassment.

To establish a prima facie hostile work environment claim for co-worker harassment, plaintiff prove: 1) that he was a member of a protected group; 2) the occurrence of unwelcome harassment; 3) a causal nexus existed between the harassment and his membership in the protected group; 4) the harassment affected a term, condition, or privilege of employment; and 5) the employer knew or should have known of the harassment and failed to take prompt and effective remedial action. <u>Jenkins v. Winter</u>, 540 F.3d 742, 749 (8th Cir. 2008). To establish a prima facie case of supervisor harassment, plaintiff must prove only the first four elements. <u>Id</u>. at 749-50. "A hostile environment exists when 'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" <u>Palesch v. Missouri Comm'n on Human Rights</u>, 233 F.3d 560, 566 (8th Cir. 2000) <u>quoting</u> <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21 (1993).

The Court liberally construes plaintiff's complaint because he is proceeding <u>pro se</u>. Nonetheless, the Court agrees with defendant that plaintiff fails to establish that the alleged hostile work environment was severe or pervasive enough such that it affected a term, condition or privilege of his employment. The Court further agrees that no causal connection exists between the perceived harassment and plaintiff's membership in a protected group.

Plaintiff has set forth no evidence, other than his own, unsubstantiated allegations of a hostile work environment; he has submitted no deposition testimony, affidavits, or testimony under oath regarding his allegations. The most the Court can say is that the record shows that plaintiff believed, almost from his hire date, that he was being "targeted" for harassment and/or dismissal by some unnamed persons at TSA. He indicated in numerous letters and statements that he felt he was being "picked on" and that his fellow co-workers and supervisors were "out to get him." It is also apparent

that he stridently believed that a "file was being kept on him" and that a screener, or a TSA "plant," was being sent to collect "intelligence" on him.

Within one month of his hire date, plaintiff started complaining about his fellow co-workers. He claimed: 1) they didn't like/made fun of his long hair and told him he should cut it; 2) that they made statements claiming his "butt was too big" and that he was a radical/Panther; 3) that he was called "gay" on two occasions; 3) that he was told by a co-worker that his mother would not approve of him; 4) that a female screener told a manager that plaintiff should be fired and whipped and slapped him on his arm; 5) that he was made to listen to anti-Catholic statements regarding the "priest scandal" on one occasion; 6) that a female screener "drove her body" into plaintiff to remove a screening wand; and 7) that he was not liked by the "Blacks" because he was "light skinned" and considered arrogant.

Even accepting plaintiff's allegations as true, such actions simply do not show that plaintiff was subjected to a hostile work environment based on either his race, color, sex, age or religion. Hostile work environment claims are limited in nature, and require a high evidentiary showing that the plaintiff's workplace is "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 2. See also O'Brien v. Department of Agric., 532 F.3d 805, 810 (8th Cir. 2008) (after protected activity, supervisor subjected plaintiffs to heightened scrutiny, reduced some of their authority, did not allow one to attend training, did not allow one to work from home, denied one a performance award, discussed suspending them, and attempted to institute disciplinary action against them, in addition to interfering with their work, isolating, embarrassing and ostracizing them; the Court of Appeals held that district court properly granted

summary judgment to the defendants because the plaintiffs' working conditions were not so severe or pervasive that they rose to the level of a hostile work environment); Nitsche v. CEO of Osage Valley Elec. Co-op., 446 F.3d 841, 846 (8th Cir. 2006) (requiring hostile work environment plaintiff to "clear a high threshold to demonstrate actionable harm"); Powell v. Yellow Book USA, Inc., 445 F.3d 1074, 1078 (8th Cir. 2006) (holding that "Title VII's purpose is not to smooth the rough edges of our daily discourse, nor to provide a federal cause of action for every slight").

The alleged harassment that plaintiff complains of is simply not "'sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" Harris, 510 U.S. at 21 quoting Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 67 (1986). Moreover, plaintiff has not shown, aside from anti-Catholic statements made by a co-worker, that any alleged harassment plaintiff was subjected to was targeting a protected trait. In other words, plaintiff has not established a causal connection between the alleged harassment he received and either his race, color, sex, or age. Plaintiff's allegations of harassment, even if the Court assumes they are such, are merely tribulations of the work place and are completely devoid of any evidence of animus based on plaintiff's race, color, sex, or age. Such a complaint simply does not state a claim of harassment. See, e.g., Faragher v. City of Boca Raton, 524 U.S. 775 (1998); Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998). Defendant's motion for summary judgment as to plaintiff's harassment/hostile work environment claims will be granted.

Additionally, from a review of the record, the Court believes as a matter of law that defendant has established an affirmative defense to plaintiff's claims of harassment. "[A]n employer is not automatically liable for harassment by a supervisor who creates the requisite degree of discrimination." Faragher, 524 U.S. at 804. An employer may "show as an affirmative defense to

liability that the employer had exercised reasonable care to avoid harassment and to eliminate it when it might occur, and that the complaining employee had failed to act with like reasonable care to take advantage of the employer's safeguards and otherwise to prevent harm that could have been avoided." Faragher, 524 U.S. at 805. The record shows that defendant had several policies in place to deal with allegations of harassment in the workplace. The record additionally shows that several of defendant's employees reviewed plaintiff's complaints and met with plaintiff and explained the various remedies available to him. There is no indication that defendant did anything other than take plaintiff's allegations seriously. Henrich, for example, spoke with plaintiff several times regarding his allegations of "targeting" and "harassment," but at each instance, Henrich was unable to substantiate plaintiff's claims. Nevertheless, Henrich reported the allegations to plaintiff's supervisors and provided plaintiff with his cell phone number and other contact information and told him to report any occurrences, in detail, as soon as they occurred. Plaintiff failed to do so. Rather, plaintiff waited more than five days to report the next instance of purported harassment, refused to give detailed information regarding the alleged exchange, and then refused to allow defendant to investigate the matter. In sum, the Court believes that defendant is entitled to the Ellerth-Faragher defense and is entitled to summary judgment as a matter of law as to plaintiff's claims of harassment.

**B.      Retaliation Claims**

Plaintiff claims that he was subjected to unlawful retaliation when a "fitness-for-duty" action was initiated on him, and additionally, when he was discharged from his employment on January 30, 2004. The government asserts it is entitled to summary judgment as to plaintiff's retaliation claims because: 1) the fitness-for-duty inquiry was not an adverse action; 2) the plaintiff cannot show a

causal connection between his termination and his protected activity; and 3) plaintiff cannot show that "but for" his protected activity he would not have been terminated.

Title VII prohibits employers from retaliating against employees for opposing any discrimination made unlawful by Title VII, or for making a charge or participating in any manner in an investigation or proceeding under Title VII. 42 U.S.C. § 2000e-3(a); see also Barker v. Missouri Dep't of Corrections, 513 F.3d 831, 834 (8th Cir. 2008). For claims of retaliation where direct evidence is not available, the McDonnell Douglas burden-shifting analysis applies. Bakhatiari v. Lutz, 507 F.3d 1132, 1137-1138 (8th Cir. 2007) (referring to McDonnell Douglas v. Green, 411 U.S. 792 (1973)). Direct evidence is evidence that establishes a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision. Twymon v. Wells Fargo & Co., 462 F.3d 925, 933 (8th Cir. 2006) citing Puttman v. Unity Health Sys., 348 F.3d 732, 735 (8th Cir. 2003). Because there is no evidence, either direct or circumstantial, showing a specific link between plaintiff's protected activity and any alleged adverse employment actions, the burden-shifting analysis set forth in McDonnell Douglas applies.

The plaintiff bears the burden of establishing a prima facie case of retaliation. Higgins v. Gonzales, 481 F.3d 578, 589 (8th Cir. 2007); see also Gage v. Potter, 2008 WL 4332202, at *9 (E.D. Mo. Sept. 17, 2008). If plaintiff establishes his prima facie case of retaliation, the burden shifts to the employer to produce some legitimate, nondiscriminatory reason for the adverse action. Gage, 2008 WL 4332202, at *9. If the employer satisfies this burden, the plaintiff must demonstrate that the proffered reason is a pretext for retaliation. Id. The ultimate burden rests with the plaintiff to establish that his employer's adverse action was in retaliation for plaintiff's protected conduct. Id.

To establish a prima facie case of retaliation, plaintiff must show that: "1) []he engaged in a protected activity, 2) []he suffered an adverse employment action, and 3) there was a causal connection between the protected activity and the adverse employment action." Jackson v. United Parcel Service, Inc., 548 F.3d 1137, 1142 (8th Cir. 2008).

### 1. The Inquiry Into a Fitness-For-Duty Examination

Plaintiff first complains that he was subjected to retaliation when Richard Nelms inquired into the possibility of requiring plaintiff to undergo a fitness-for-duty evaluation in April of 2003. The government asserts that this "inquiry" cannot be construed, on its face, as an adverse employment action, and it additionally argues that because a fitness-for-duty examination was never initiated on plaintiff, it cannot suffice as retaliation.

To establish an adverse employment action in the context of a retaliation claim, plaintiff must demonstrate that a reasonable employee would have found the defendant's actions "materially adverse," meaning they "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).

The Eighth Circuit has questioned whether requiring a fitness-for-duty examination could ever be considered an adverse employment action, and has twice determined that it is not. See Schoffstall v. Henderson, 223 F.3d 818, 825 (8th Cir. 2000) (finding fitness-for-duty examination did not constitute an adverse employment action; Vislisel v. Turnage, 930 F.2d 9 (8th Cir. 1991) (affirming district court's finding that employer requiring employee to submit to physical and, if necessary, psychiatric examination was not an adverse employment action). Although this Court recognizes that since the Eighth Circuit's holding, the definition of an adverse employment action has been broadened

under <u>Burlington Northern</u>, even under this new standard, a plaintiff must still demonstrate that the challenged action "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 68. The Eighth Circuit requires the plaintiff to show that the adverse employment activity "produced significant harm" or "materially significant disadvantage." <u>See</u> <u>Buboltz v. Residential Advantages, Inc.</u>, 523 F.3d 864, 868 (8th Cir. 2008); <u>Devin v. Schwan's Home Service, Inc.</u>, 491 F.3d 778, 786 (8th Cir. 2007).

Plaintiff has not shown that he suffered any harm or disadvantage with respect to the inquiry, and in fact, he was not required to undergo a fitness-for-duty examination as no such inquiry existed under the TSA guidelines. Moreover, it is telling that plaintiff did not even find out about the inquiry until January 2004, approximately a year after he had complained to an EEO officer. Thus, the inquiry itself did not in any way dissuade plaintiff from making or supporting a charge of discrimination.

Lastly, the Court notes that Nelms's inquiry in April of 2003 into whether plaintiff could be forced to submit to a fitness-for-duty evaluation came directly after what can only be described as "bizarre" actions by plaintiff. In March of 2003 plaintiff was overheard stating, at a security screening checkpoint and in front of airline passengers, that "Saddam is the man." These statements were substantiated by plaintiff's co-workers during an investigation of the incident. Plaintiff's statements, along with his continued insistence that someone was "out to get him"; that a "file was being kept on him"; and that a screener or a TSA "plant" was being sent to collect "intelligence" on him, raised red flags such that a Human Resources Specialist like Nelms might reasonably inquire whether a fitness-for-duty examination should be undertaken to determine whether plaintiff was fit to screen airline passengers under post 9/11 circumstances. Thus, defendant has proffered a legitimate, non-discriminatory reason for pursuing an inquiry into the possibility of doing a fitness-for-duty

examination, and plaintiff has not presented any evidence that these reasons were pretextual. Accordingly, plaintiff's claim that he was subjected to retaliation when Nelms inquired into initiating a fitness-for-duty examination on plaintiff is without merit.

2.    Plaintiff's Termination

Plaintiff also argues that his termination was done in retaliation for his complaints of harassment. The government argues that it is entitled to summary judgment on this claim because he has not demonstrated any causal connection between the exercise of his rights under federal anti-discrimination laws and the termination of his employment on January 30, 2004. In so arguing, defendant notes that plaintiff has not produced any evidence that his termination was in retaliation for his engagement in protected activity, instead resting his argument on the temporal connection between the two acts. The Court agrees that the mere fact that plaintiff initiated an EEO complaint in January 2003, is not sufficient to show that his January 30, 2004 termination, nearly twelve months later, was retaliatory.

"To prove a causal connection under the third element, a plaintiff must prove that an employer's retaliatory motive played a part in the adverse employment action." Gilooly v. Missouri Dep't of Health & Senior Servs., 421 F.3d 734, 739 (8th Cir. 2005). Direct evidence is not required, rather "'[e]vidence that gives rise to an inference of retaliatory motive on the part of the employer is sufficient to prove a causal connection.'" Id. at 739-740 quoting Kipp v. Missouri Highway & Transp. Comm'n, 280 F.3d 893, 896-97 (8th Cir. 2002). "The timing of a plaintiff's discharge in relation to his protected activity can sometimes establish causation for the purpose of establishing a prima facie case," Sherman v. Runyon, 235 F.3d 406, 410 (8th Cir. 2000), but "'[g]enerally, more than a temporal connection ... is required to present a genuine factual issue on retaliation.'" Kipp,

280 F.3d at 897 quoting Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1136 (8th Cir. 1999). "[T]he timing of the discharge is usually evaluated in light of other evidence, or lack of other evidence, in the record." Sherman, 235 F.3d at 410.

Although the timing of an adverse employment action may be relevant in determining whether the motive for the act was unlawful retaliation, to demonstrate a nexus based on temporal proximity, the period of time separating the events must be very close. See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001) (noting that the temporal proximity between an employer's knowledge of protected activity and an adverse employment action must be "very close"); Kipp, 280 F.3d at 897 (timing of discharge, without more, is "rarely sufficient" to show retaliation). The twelve-month gap between the plaintiff's complaints and his termination is simply too substantial to demonstrate a nexus. See, e.g., Dhyne v. Meiners Thriftway, Inc., 184 F.3d 983, 989 (8th Cir. 1999) (concluding a four-month gap weakened the inference of retaliation); Recio v. Creighton Univ., 521 F.3d 934, 941 (8th Cir. 2008) (temporal connection of six months "not close enough to raise an inference of causation"); Breeden, 532 U.S. at 273-74 ("[a]ction taken twenty months later suggests, by itself, no causality at all."); Kipp, 280 F.3d at 897 ("the interval of two months between the complaint and [the] termination so dilutes any inference of causation that we are constrained to hold as a matter of law that temporal connection could not justify a finding in [plaintiff's] favor on the matter of a causal link"); Back v. Danka Corp., 335 F.3d 790, 792 (8th Cir. 2003) (holding adverse employment action shortly after the filing of the claim is certainly some evidence of causation but is insufficient standing alone). Moreover, as defendant notes, plaintiff's retaliation claim is weak because defendant seriously looked into plaintiff's allegations and attempted to address plaintiff's concerns even before he filed his EEO complaint. See Logan v. Liberty Healthcare Corp., 416 F.3d

877, 882 (8th Cir. 2005) ("evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of temporal proximity.")

Given the aforementioned, the Court finds that plaintiff has failed to show a causal nexus between his engagement in protected activity and his termination, and he cannot establish a prima facie case of retaliation. Furthermore, the Court notes that the record establishes that defendant had a legitimate, non-discriminatory reason for terminating plaintiff's employment.

Plaintiff was terminated from his employment for engaging in an altercation with physical contact with his supervisor and for making a false statement. These actions were taken in front of airline passengers, as well as plaintiff's co-workers. It is undisputed that plaintiff's actions violated TSA policies regarding employee responsibilities and conduct. Plaintiff disagreed with the facts leading up to his discharge, but in responding to defendant's motion for summary judgment, he provided no admissible evidence to create a genuine issue of material fact. Other than his own opinion and his unsupported denials of the events surrounding the decision to terminate his employment, plaintiff has submitted no evidence demonstrating that his complaints were the motivating factor for the termination.[7] Stuart v. General Motors Corp., 217 F.3d 621, 636 (8th Cir. 2000) (noting plaintiff's denial of facts surrounding his termination was not evidence to establish that defendant's stated reasons for the discharge were a pretext for discrimination).

In sum, there is simply nothing in the record to give rise to an inference of retaliatory motive on the part of defendant, as required to prove that a causal connection exists. The temporal

---

[7] Again, the Court notes that plaintiff did not respond to defendant's statement of undisputed facts or file a statement of material facts as to which he contends a genuine issue of fact exists. Furthermore, plaintiff did not submit any deposition testimony, affidavits, or declarations supporting his allegations, and his complaint was not verified.

connection between the protected activity and the termination is attenuated and insufficient alone to establish a showing of causal connection. Moreover, plaintiff provided no other admissible evidence of retaliatory motive. Finally, defendant did provide evidence that plaintiff's discharge was based on legitimate reasons – namely plaintiff's own conduct – and plaintiff has not rebutted defendant's proffer. Thus, defendant is entitled to summary judgment on plaintiff's retaliation claims.

### C. Failure to Exhaust Administrative Remedies

Defendant moves to dismiss plaintiff's allegations of sex discrimination on the basis that plaintiff did not include them in his EEO complaint, and therefore has failed to exhaust administrative remedies with respect to those claims.

"Federal employees asserting Title VII claims must exhaust their administrative remedies as a precondition to filing a civil action in federal district court." McAdams v. Reno, 64 F.3d 1137, 1141 (8th Cir. 1995) citing Brown v. General Services Admin., 425 U.S. 820, 835 (1976). Failure to exhaust administrative remedies bars a plaintiff from raising the Title VII claims in federal court. Brown, 425 U.S. at 832; Briley v. Carlin, 172 F.3d 567, 571 (8th Cir. 1999).

As a federal employee, plaintiff must follow administrative procedures and exhaust administrative remedies by raising a claim of discrimination in an EEO complaint. The scope of any subsequent federal court action is defined by the claims that were actually filed in the prior EEO complaint or claims that are like or reasonably related to the claims asserted therein. Brown, 425 U..S. at 832; Anderson v. Block, 807 F.2d 145, 148 (8th Cir. 1986). "The sweep of any subsequent judicial complaint may be only as broad as the scope of the EEOC investigation which could reasonably be expected to grow out of the charge of discrimination." Duncan v. Delta Consol. Indus.,

Inc.,371 F.3d 1020, 1025 (8th Cir. 2004). "Allegations outside the scope of the EEOC charge ... circumscribe the EEOC's investigatory and conciliatory role, and for that reason are not allowed." Id. quoting Kells v. Sinclair Buick-GMC Truck, Inc., 210 F.3d 827, 836 (8th Cir. 2000).

The Court is mindful that plaintiff filed his EEO complaint pro se, and therefore construes it liberally. Nonetheless, "there is a difference between liberally reading a claim which 'lacks specificity,' ... and inventing ... a claim which simply was not made." Shannon v. Ford Motor Co., 72 F.3d 678, 685 (8th Cir. 1996). Having carefully reviewed plaintiff's EEO complaint, the Court finds that plaintiff did not include information in his complaint concerning the purported sex discrimination. He did not check the box indicating that he was being discriminated against on the basis of his sex, nor did he indicate, in his typewritten statements and addenda, that he believed he was being targeted as a result of his gender. Moreover, plaintiff presents no argument or evidence to this Court demonstrating that his current claims of gender discrimination are like or reasonably related to any claim raised in his EEO complaint or considered by the agency such that the claims should be considered exhausted. Plaintiff also has not presented the Court with any argument or evidence demonstrating that either waiver, estoppel or equitable tolling applies so as to excuse his failure to administratively exhaust the claims.

As such, the Court finds that plaintiff's allegations of sex discrimination are unexhausted, and defendant's request for dismissal of these claims for failure to exhaust administrative remedies should will be granted.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion to dismiss, construed as one for summary judgment, is **GRANTED.** [Doc. 75]

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is **GRANTED.** [Doc. 78]

**IT IS FURTHER ORDERED** that plaintiff's motions requesting leave to file sur-responses and to file an amended complaint are **GRANTED IN PART AND DENIED IN PART.** Plaintiff's request to file sur-responses are **GRANTED** but plaintiff's request to file an amended complaint is **DENIED.** [Docs. 85 and 86]

An appropriate judgment will accompany this Memorandum and Order.

_____
**CHARLES A. SHAW**
**UNITED STATES DISTRICT JUDGE**


Dated this   22nd   day of September, 2009.